# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4314 | **DATE** | 12/22/2004 |
| **CASE TITLE** | Liberty Mutual Insurance Company vs. American Home Assurance Company | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Liberty Mutual's motion for summary judgment is denied and American Home's motion for summary judgment [72-1] is granted as to both counts of the Plaintiff's First Amended Complaint. In light of the Court's decision on the issues of direct duty and equitable subrogation, the Court need not address the issues of breach and causation.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | DEC 2 7 2004 | date docketed | 99 |
| ✓ | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | |
| DK6 | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 02 C 4314 |
| v. | ) ) | Magistrate Judge Morton Denlow |
| AMERICAN HOME ASSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In a matter of first impression, this Court is tasked with determining whether Illinois law imposes a duty to settle upon one lower-tiered excess insurer to another higher-tiered excess insurer. In 2002, following a collision between a freight train and an automobile, a jury awarded three plaintiffs over $54 million against the Illinois Central Railroad Company ("Illinois Central") and Chicago, Central & Pacific Railroad Company ("Chicago Central"). Liberty Mutual Insurance Company ("Liberty Mutual") and American Home Assurance Company ("American Home") were both excess insurers to these railroads. After the verdict, the higher-tiered excess carrier, Liberty Mutual, sued the lower-tiered excess carrier, American Home, claiming that American Home breached its duty to Liberty Mutual to settle the case and should therefore pay all amounts that Liberty Mutual may be obligated to pay with regard to the verdict. This Court is now presented with cross-motions for summary judgment on the issues of duty, breach, and causation. The Court holds, as a matter of law,

that American Home did not owe a duty to Liberty Mutual to settle the case. Therefore, this Court grants American Home's motion for summary judgment and denies Liberty Mutual's motion for summary judgment.

# I. BACKGROUND FACTS[1]

## A.    THE ACCIDENT

On January 9, 2001, a train operated by Chicago Central collided with a Ford Explorer at a grade crossing in Bloomington, Illinois. The Explorer was driven by Lilia Apulello, age 38. Lilia's parents, Fidel Velarde and Francisca Velarde, both age 72, were passengers. Illinois Central operated and controlled the railroad tracks where the accident occurred. J.S. 11. A newspaper account dated January 10, 2001, regarding the accident reported that the grade crossing accident occurred when safety gates failed to lower, and further reported that "a railroad spokesman said that the train was supposed to stop at the crossing because the rail line was aware that there were problems with the warning gates." J.S. 12. The newspaper account also reported that the impact of the collision tossed the vehicle 150 yards, and that the Velardes were in critical condition. The report also quoted a railroad spokesman as stating: "This is a problem we were aware of." *Id.*

---

[1] The following facts are taken from the "Joint Statement of Stipulated Facts" filed by the parties upon request of this Court. References to "J.S. _" are to paragraphs in the Joint Statement. This opinion also refers to facts taken from the parties' separate fact statements. References to "L.M _" are to paragraphs in "Liberty Mutual's Separate Statement of Material Facts" and references to "A.H_" are to paragraphs in "American Home's Additional Statement of Facts."

**B.    THE PLAINTIFFS FILE SUIT**

All three crash victims survived.  However, as a result of the accident, Lilia Apulello, Fidel Velarde, and Francisca Velarde all suffered severe brain injuries which resulted in cognitive and behavioral impairments, depression, and Post-Traumatic Stress Disorder.  J.S. 14-16.  On January 11, 2001, both the Velardes and Lilia Apulello filed separate lawsuits (the "Underlying Action") in the Circuit Court of Cook County against Illinois Central and Chicago Central for the injuries they sustained in the accident.  The lawsuits were later consolidated for discovery and trial.  Raphael Apulello, Lilia's husband, later joined as a plaintiff when he filed a claim for loss of consortium.  J.S. 13.   The trial was originally set for November 14, 2001 but was later moved to January 24, 2002.

**C.    THE RAILROAD DEFENDANTS**

Illinois Central and Chicago Central are both wholly-owned subsidiaries of the Canadian National Railway Company ("Canadian National").  J.S. 3.  At the time of the accident, Canadian National had a multi-tiered risk management program in place.  Canadian National's first layer of protection against claims was an uninsured $5 million (U.S.) self-insured retention ("SIR").  The second tier of coverage was a $20 million (Canadian)[2] layer of insurance provided by American Home (the "American Home Policy").  The third tier was a $75 million (Canadian) layer of excess insurance provided by several insurance companies, including a policy by Liberty Mutual (the "Liberty Mutual Policy") for $37.5

---

[2] At the time of the lawsuit, $20 million Canadian equaled about $12.5 million U.S. currency.

million (Canadian).  J.S. 4.

## D.    THE AMERICAN HOME POLICY

The American Home Policy is entitled "Claims Made Excess Liability Policy."

Compl. Exh. B.  The policy includes the following important clauses: Condition D of the

American Home Policy provides as follows:

### REPORTING OF CLAIMS

The Insured shall as soon as practicable give notice, in writing, to the entity designated in Item 4 [American Home] of the Declarations of any occurrence, claim, or suit which the Insured reasonably expects to deplete the Underlying Amount as stated in Endorsement No. 2 by more than 50%.

If the underwriters are not so notified, such as that the underwriters' position is prejudiced, then no coverage is provided by this Policy for such claim.

Reporting in accordance with this Condition is for information purposes only and does not modify the Insured's rights and duties as stipulated elsewhere in the policy.

*Id.* Condition E of the American Home Policy provides:

Underwriters shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Insured but the Underwriters shall have the right and shall be given the opportunity to associate with the Insured in the defense and control of any claim, suit, or proceeding relative to any Loss either hereunder or within the Underlying Amounts, in which event the Insured and Underwriters shall co-operate in all things in the defense of such claim, suit, or proceeding and the Insured shall make available to Underwriters such information and access to records as Underwriters may require.

*Id.* Condition H of the American Home Policy provides:

Liability under this Policy with respect to any Loss shall not attach unless and until the Underlying Amounts have been satisfied by actual payment of such Loss.  The insured shall make a request to the entity

designated in Item 4 of the Declarations [American Home] for indemnification in respect of any Loss for which Underwriters may be liable under this Policy within the twelve months after the Insured shall have paid an amount of the Ultimate Net Sum Payable in excess of the Underlying Amounts. Such amount shall be due and payable within thirty days after it is respectively claimed and proven in conformity with this Policy.

*Id.*

## E.     THE LIBERTY MUTUAL INSURANCE POLICY

Liberty Mutual's policy with Canadian National is also entitled "Claims Made Excess Liability Policy." Compl. Exh. A. The Liberty Mutual Policy contains the following important provisions: Section II (Defense and Supplementary Payments) provides:

The Insurer will have the right but not the duty to participate in the investigation, settlement or defense of any claim or suit which relates to any claim that the Insurer believes may create liability on its part under the terms of this policy. The Insurer will have a duty to defend such claims or suits when the applicable limit of "underlying insurance" has been exhausted by payment of "loss".

*Id.* Section VI, Paragraph D, set out the conditions for notice:

The Named Insured must see to it that the Insurer:

1.     is notified as soon as possible of any occurrence, claim or suit which may result in a "loss" covered under this policy;
2.     receives notice of a claim or suit as soon as possible;
3.     is assisted, at its request, to enforce any right against any person or organization which may be liable to an Insured because of injury or damage to which this insurance applies; and
4.     receives the Insured's full cooperation in the investigation, settlement or defense of any claim or suit.

The Insured may not make any admission of liability or, except at its own cost, incur any expense or make any payment other than for first aid.

*Id.*

## F.    NOTICE OF THE UNDERLYING LITIGATION

By January 11, 2001 (the day the suits were filed), Canadian National's claim agent had been to the scene of the accident and had conducted an investigation. J.S. 17. Canadian National's in-house counsel responded to the complaint and assumed the defense of Canadian National.   Canadian National selected and retained the Chicago law firm of Connelly, Roberts & McGivney, L.L.C. to represent Canadian National's interests in the consolidated lawsuits.  Canadian National and Michael Connelly ("Connelly") agreed as to what Connelly's firm's rates would be and Connelly reported directly to Canadian National. J.S. 18.

### 1.    Canadian National Notifies its Insurance Broker, Marsh Canada

On January 11, 2001, Charles Webster ("Webster"), General Counsel for Canadian National, sent the underlying complaints to Eckart Russell ("Russell"),[3] a Managing Director of Risk Management at Marsh Canada, Ltd. ("Marsh"), Canadian National's "broker of record" with a cover letter that stated:  "Put the interested underwriters on notice." J.S. 19. The letter enclosed a copy of the complaint in the Underlying Action, a copy of a motion for a protective order, and the newspaper account of the accident.  At the time of his letter, Webster knew that American Home was the carrier providing the first layer of insurance

---

[3] Russell is a Managing Director of Risk Management at Marsh.  He described his role as an "insurance broker" for Canadian National - collecting "underwriting" information about the company, placing such information into a "submission" that is provided to prospective insurers for a new or renewal policy, and then negotiating the premium, terms and conditions of a potential policy with the various insurers in the market.  J.S. 44.

above Canadian National's $5 million but did not know the identities of the insurers above American Home's limits. *Id.*

### 2.     Marsh Notifies American Home

On January 12, 2001, Marsh sent written notice to American Home on behalf of Canadian National and its two subsidiaries regarding the accident and the Underlying Action. Marsh also sent American Home a copy of the Velardes' Amended Complaint, the newspaper article regarding the accident, and a copy of Webster's letter requesting Marsh to notify "the interested underwriters." J.S. 23. American Home assigned the claims to Ms. Celine Tasse ("Tasse"), a claims analyst in American Home's office in Montreal, Canada. After reviewing the claims, Tasse described the Velardes as being in "critical condition" and Lilia Apulello's injuries as being "minor." J.S. 24-25.

### 3.     Marsh Fails to Notify Liberty Mutual

Marsh did not report the claim to Liberty Mutual when it reported the claim to American Home. On February 13, 2001, Webster sent a letter to Marsh enclosing the Velardes' Amended Complaint and once again requested that Marsh "put the interested underwriters on notice." J.S. 30. Marsh forwarded this letter and the Amended Complaint to Tasse at American Home but not to any other insurance carriers. J.S. 31.[4]

---

[4] Webster testified at his deposition that when he sent the February 13, 2001 letter to Marsh requesting that Canadian National's underwriters be notified, he expected and intended for Marsh to notify all of Canadian National's excess insurers, including Liberty Mutual. J.S. 32.

### G. CANADIAN NATIONAL ASSESSES ITS LIABILITY

At the outset, Canadian National took sole control of the defense and strategy of the case. J.S. 33-34. At some point during the litigation of the Underlying Action, Illinois Central admitted that its negligence caused the accident. The decision to admit liability was made solely by Illinois Central. J.S. 36. Beginning in September, 2001, Canadian National began to make several estimates of the extent of its liability in the underlying action. These estimates grew exponentially as the trial date approached.

### 1. The Renewal Submission Estimate

On September 21, 2001, Russell of Marsh sent Liberty Mutual a "renewal submission"[5] on behalf of Canadian National containing extensive information about Canadian National, including a 10-year listing of claims against the company. J.S. 43. The Velarde case was included in the 10-year history of claims against Canadian National but the Apulello case was not included in the renewal submission. J.S. 45. The claims information in the renewal submission stated that in Canadian National's assessment, none of the accidents that occurred during the past two years were expected to result in claims in excess of the $5 million SIR.[6] J.S. 46. The renewal submission valued the Velarde claims at $2.5

---

[5] The renewal submission was essentially a profile of Canadian National, including information regarding its financial structure, its size, its sales, its products and services, and a claims history. The principal purpose of such information is to enable the prospective insurer to make an underwriting decision as to whether it wants to insure, or continue to insure, the customer. J.S. 43.

[6] For the remainder of the opinion all monetary amounts will be discussed in terms of U.S. dollar amounts.

million. J.S. 45. As of September 1, 2001, Canadian National had a $2.5 million reserve reflecting its estimation of a reasonable settlement value for both the Velarde and Apulello suits. J.S. 48.

## 2. Connelly's Reports and Mock Trials

On September 24, 2001, in the first of the defense reports, lead defense counsel Connelly advised Canadian National that he evaluated the value of the collective verdict of the three plaintiffs as between $4 - $9 million. R. 49. A month later, on October 25, 2001, lead defense counsel Connelly provided a report to Canadian National, wherein he reported that the estimated "collective verdict exposure for the three plaintiffs [was] $8 - $12 million, not including any punitive component." J.S. 52. Connelly testified that his change in the valuation of the case between September 24, 2001 and October 25, 2001 was based upon his preparing a focus group and therefore he was looking at the evidence in a different context than he did during discovery. J.S. 53.

In late October 2001, and again in December 2001, Connelly conducted two mock jury trials regarding the Velarde and Apulellos claims, resulting in four mock jury verdicts (two from each trial). The first mock trial took place on October 27, 2001. One of the two mock jury verdicts awarded $4,390,000 to Francisca Velarde, $3,842,000 to Fidel Velarde, $8,875,000 to Lilia Apulello (which was thereafter reduced by the mock jury by 10% for Lilia's comparative fault), for a total verdict in excess of $17.1 million. The other mock verdict in October 2001 resulted in an award to Francisca Velarde of $1,929,000, to Fidel Velarde of $2,162,000 and to Lilia Apulello of $4,375,000 (which was thereafter reduced

9

by the mock jury by 10% for Lilia's comparative fault), for a total verdict in excess of $8.46 million. The second mock trial took place on December 8, 2001. Of these two mock jury verdicts, one awarded $2,950,000 to Francisca Velarde, $3,320,000 to Fidel Velarde, and $1,950,000 (less 10% for her comparative fault) to Lilia Apulello for a total verdict of $8.22 million. The other verdict awarded $2,114,000 to Francisca Velarde, $2,220,000 to Fidel Velarde, and $850,000 (less 25% for her comparative fault) to Lilia Apulello for a total verdict of $5.18 million. These awards did not include any amount for punitive damages. J.S. 54.[7]

Connelly's firm sent the results of the October 27, 2001 focus group to Canadian National on November 1, 2001. In the November 1, 2001 letter to Canadian National, Connelly also informed Canadian National that because his firm had successfully argued against the plaintiffs' motion, "the exposure of punitive damages is no longer a threat." J.S. 57. The results of the first focus group were conveyed to American Home on January 17,

---

[7]Connelly testified at his deposition that one focus group's combined verdict of approximately $17.1 million did not provide an indication that there was a high likelihood of a verdict in excess of $17.5 million because of a number of reasons, including: (1) the focus group heard arguments regarding punitive damages, which were subsequently excluded from the case; (2) based on his experience, he does not necessarily correlate focus group verdicts and ultimate verdicts based on "a variety of reasons, including the absence of live witnesses during the focus groups"; and (3) a jury focus group is "a very controlled presentation." Connelly further testified that the jury focus group results were "a good indicator that the verdict was probably in a range certainly above $5 million but not necessarily above $17 million." J.S. 55. The purpose of the second focus group was to find out if the verdicts would change because punitive damages were no longer implicated in the case. J.S. 56.

2002, and the second set of the focus group results were conveyed to American Home on January 18, 2002. J.S. 58.

On December 21, 2001, in a defense report, Connelly sent a letter to Webster at Canadian National, in which he made the following estimates regarding the verdict value of the Velarde and Apulello claims:

| | | |
|---|---|---|
| · | Lilia Apulello: | $1 million - $2 million |
| · | Fidel Velarde: | $2 million - $3.5 million |
| · | Francisca Velarde: | <u>$2 million - $3 million</u> |
| · | TOTAL: | $5 million - $8.5 million |

J.S. 62. He reported his opinion that Canadian National had valid arguments to make at trial. J.S. 63. He also reported that the second set of jury focus group results relating to Lilia Apulello's damages were "a more accurate prediction of what a jury would award" than the first set of jury focus group results because punitive damages were not presented to the second jury focus group. J.S. 64. Webster stated, in a January 8, 2002 internal memorandum, that he agreed with Connelly's verdict value set forth in his December 21, 2001 report and was convinced that plaintiffs would try the case unless they could settle it for at least $10 million. J.S. 66.

### 3. The Plaintiffs' Settlement Demand

By letter dated January 15, 2002, the Velardes and the Apulello's made a $30 million settlement demand on Canadian National ($15 million on behalf of Fidel and Francisca Velarde and $15 million on behalf of Lilia and Raphael Apulello). J.S. 81-82. The letter also indicated that the Velardes would not accept as little as $5 million because the railroads

11

had admitted liability for the train/car collision of January 9, 2001 and because both Fidel and Franscisca had sustained internal injuries and traumatic brain injuries in the collision. J.S. 83.

## H.   AMERICAN HOME BECOMES ACTIVELY INVOLVED

On December 20, 2001, Tasse from American Home had her first communication with Canadian National about the Underlying Action. Tasse e-mailed Canadian National, requesting the status of several claims, including the Underlying Action. J.S. 67. Canadian National responded by e-mail a few hours later on December 20, 2001, informing Tasse that the mock jury had produced significantly high verdicts and that the settlement was likely to exceed the railroad's SIR. J.S. 68. On January 7, 2002, Tasse returned Canadian National's e-mail and requested a report as to damages and liability for the Underlying Action. J.S. 71.

In the beginning of January 2002, Marsh received a telephone call from Canadian National advising it that Canadian National wanted to tender its $5 million SIR to American Home. Marsh arranged for a meeting on January 17, 2002 with both Canadian National and American Home personnel. J.S. 72.

### 1.   The January 17 Meeting: American Home is Advised of the Potential Scope of Liability

The January 17, 2002 meeting was held at Canadian National's offices in Montreal and was attended by representatives from Marsh, Canadian National, and American Home. J.S. 85. Martin Cote ("Cote"), a claims supervisor at American Home who had previously been responsible for the Canadian National account, accompanied Tasse to the meeting. J.S.

73. Cote's notes reflect that Canadian National advised American Home during the meeting that:

i) mock jury trials in the Underlying Action had resulted in verdicts ranging from $4 million to $18 million;

ii) Illinois Central had admitted negligence;

iii) the Velarde plaintiffs demanded $15 million to settle their claim;

iv) the Apulellos demanded $15 million to settle their claim;

v) Canadian National attempted to settle the case within its $5 million SIR, but the plaintiffs rejected its offer;

vi) the trial was scheduled to commence in one week, on January 24, 2002; and

vii) Canadian National reported that they delayed advising American Home about the trial because they were "surprised that the case moved so quickly."

J.S. 85. At the January 17, 2002 meeting, Canadian National's in-house counsel, Webster, also provided American Home with a copy of a January 15, 2002 letter from Connelly, wherein he estimated the combined verdict value to be $5 million to $8.5 million. *Id.* That same day, Webster also faxed a letter to American Home describing the Plaintiffs' demands and Canadian National's view that the combined verdicts would far exceed its SIR of $5 million. J.S. 87. The letter also made clear that the Canadian National SIR was available to American Home to assist it in settling the case. *Id.*

After Webster sent the January 17, 2002 letter to American Home, Canadian National continued to direct and control the defense of the Velarde and Apulello cases. J.S. 88. Webster testified that by sending this letter, Canadian National understood that it had relinquished control of the settlement negotiations to American Home. J.S. 89.

## 2.   American Home Retains Counsel

On January 17, 2002, American Home hired James McCarthy ("McCarthy"), a

13

Chicago attorney, to assist in settling the case. J.S. 90, 94. American Home also retained Peter Kassebaum ("Kassebaum"), an assistant vice-president of AIG based in New York. J.S. 91.

Upon reviewing the case for AIG, Kassebaum instructed Cote to send a "hammer letter" to Canadian National, stating that Canadian National was responsible for the delay that caused a last-minute flurry of activity and to further demand that Canadian National "make every possible effort to settle the matter. Issues as to reimbursement under the policy can be worked out later." J.S. 93.

On January 18, 2002, Cote responded by e-mail stating, in part: "it seems that they [Canadian National] had already offered their retention of $US 5 Million, which was flatly refused by the Plaintiffs (their joint demand is in the amount of $US 30 Million). We can certainly issue some sort of ROR [reservation of rights] letter and emphasize on the fact that they should have reported the up-coming trial sooner, but I am not certain that it would be the solution to let them [Canadian National] settle the case without our involvement. That is why I retained McCarthy to act as control attorney." J.S. 94.

On January 18, 2002, a "Request for Settlement Authority" form was filled out by American Home in Montreal, which references defense counsel's evaluation of an estimated verdict range of $5 million to $8.5 million. J.S. 95. On January 18, 2002, the December 8, 2001 focus group results were sent to American Home. J.S. 96. A letter dated January 21, 2002, from American Home to Canadian National stated, in part, "we strongly suggest that you take all steps necessary to protect your $5,000,000 SIR and prevent possible exposure

14

to our excess policy." J.S. 97.

On January 25, 2002, American Home prepared a memorandum that summarized Canadian National's valuation of the potential verdict value for the Velardes' and Lilia Apulello's claims collectively at $5 million to $8.5 million. This estimate was based on information provided by Canadian National's defense counsel. J.S. 100. By January 28, 2002, American Home assessed a potential verdict value for the case at $10 million and established its reserve for the claims at $10 million. J.S. 102. On that same date, American Home also retained other counsel to monitor the case for purposes of identifying potential appellate issues. J.S. 101.

## D.    THE SETTLEMENT CONFERENCE

On January 28, 2002, trial on the Underlying Action was set to begin. J.S. 103. Prior to trial, the trial judge held a settlement conference. Defense counsel Connelly advised the Judge that he thought the defense should start between $4 million and $7 million so that the underlying plaintiffs would know that the defendants were willing to have serious discussions. Connelly later testified that he did not believe that $7 million would settle the claims. Connelly further testified that at the time of the settlement conference, he was aware of no facts as to whether an offer of $4 million to $7 million would have led to a settlement of both the Velarde and Apulullo cases for an amount below $8.5 million. J.S. 104. However, American Home did not make any settlement offer to either the Velardes or the Apulellos during the settlement conference. J.S. 105.

## E. THE TRIAL BEGINS, SETTLEMENT NEGOTIATIONS CONTINUE, AND THE DEFENSE EXPERIENCES SETBACKS

On January 29, 2002, after the trial of the Underlying Action had commenced, American Home (through attorney McCarthy) offered the Velardes a total of $2 million for their claim -- $1 million to Francisca and $1 million to Fidel. The Velardes did not respond to American Home's January 29, 2002 offer. American Home did not make an offer to Lilia Apulello or her husband for their claim. J.S. 106.

During the course of the trial, the judge allowed the plaintiffs to show the jury a day-in-the-life video of Lilia Apulello which had been disclosed to the defense for the first time around the time of jury selection. Although Connelly objected to the video because he believed it was unfairly prejudicial and because it had not been previously produced, the judge overruled his objections. J.S. 108. The video contained footage of Lilia Apulello and her mother, Francisca Velarde which showed the plaintiffs to be "just about totally disabled." J.S. 109.

A day or two before Canadian National's medical expert was scheduled to testify for the defense, he advised Connelly that he could no longer testify consistently with his deposition testimony where he had opined that Lilia Apulello's preexisting deteriorating brain condition was unrelated to the accident in question. J.S. 110. Connelly thought that the best way to handle the expert's reversal was to not have him testify as to the "pre-existing neurological condition defense" in connection with Lilia Apulello, but to still have him testify as to the Velardes. J.S. 111. As a result, the testimony of the plaintiffs' medical

expert with respect to Lilla Apulello's injuries went unchallenged by any defense expert at trial.[8] J.S. 112. Connelly discussed his decision with respect to the medical expert's testimony with American Home's appellate counsel, who concurred with Connelly. J.S. 114. At no time did American Home instruct Connelly not to proceed in the manner he had chosen to do so with the expert's testimony at trial. *Id.*

On February 6, 2002, Connelly advised McCarthy that he intended to suggest to the jury numbers that would exceed the $5 million SIR. McCarthy advised Connelly that American Home did not want Connelly to suggest a damages number to the jury. On February 7, 2002, Connelly advised Kassebaum that he intended to give the jury, in his closing argument, an "eight-figure" amount -- an amount in excess of $10 million - that he thought was appropriate as an award to the plaintiffs. Kassebaum urged Connelly not to put an amount in the closing based on past experience at trial, and the belief "that the best way to present it was in a different way, rather than giving a floor which included such a high number." Kassebaum suggested to Connelly "that there were alternate ways to deliver a message of fairness without using that number." J.S. 116.

The plaintiffs asked the jury for $121,200,000. L.M. 23. On February 8, 2002, during closing arguments, Connelly suggested that the jury award damages as follows: $2,004,396 for Fidel Velarde, $2,200,000 for Francisca Velarde, $5,905,000 for Lilia Apulello, and $2

---

[8] Up until this point in the trial, on or about February 6, 2002, Canadian National still believed that the case had a net verdict value of between $5 million and $8.5 million to all plaintiffs. J.S. 113. However, it was Webster's opinion that Dr. Kelly's change of opinion as to Lilia Apulello led to the high verdict. J.S. 115.

17

million for Raphael Apulello, for a total verdict of $12,109,396. J.S. 118.

By letter dated and faxed on the same day, American Home made a settlement offer of $1.5 million to each of the Velardes, for a total settlement offer of $3 million to the Velardes. J.S. 119. The Velardes' attorney, Cavanaugh, received American Home's settlement offer when he returned from court after his closing arguments. J.S. 120. He did not respond. J.S. 121.[9] That same day, American Home also sent a $2 million settlement offer to Lilia Apulello. J.S. 123. The Apulellos did not lower their settlement demand of $15 million in response to the $2 million offer. J.S. 124.

## H.    THE VERDICT

On February 8, 2002, the jury returned the following verdicts totaling over $54 million:

| | |
|---|---|
| L. Apulello | $29,402,500.00 |
| R. Apulello | $ 3,325,000.00 |
| Fidel Velarde | $15,114,396.00 |
| Francisca Velarde | $ 6,196,010.65 |
| Total | $54,037,906.65 |

The jury attributed fault as follows: Illinois Central 60%; Chicago Central 35%; and Lilia Apulello 5%. J.S. 125.

On February 11, 2002, Marsh sent a letter to Tom Painter, Liberty Mutual's Head of

---

[9] When asked why he did not lower his $15 million demand in response to the $3 million offer to his clients during jury deliberations, Cavanagh testified: "even the amount that [defense counsel] recommended that the jury award in an admitted liability case ... was more than the $3 million offered ... I've never heard of [the jury] coming back [with] less than what the defense attorney recommended." L.M. 19.

Claims, which reads: "As a result of the enclosed self-explanatory letter received from Commerce & Industry, I have no alternative but to put [Liberty Mutual] on notice, as there is a possibility that the captioned claim may reach your layer." J.S. 130. On February 12, 2002, four days after the verdict was entered, Liberty Mutual received Marsh's letter, and thereafter learned that the case had been litigated through trial and that an excess verdict had been rendered. J.S. 131.

A state appeals panel affirmed the $54,037,906.65 verdict on November 8, 2004. *Velarde v. Ill. Cent. R.R. Co.*, No. 1-02-1859, 2004 WL 2546825 (Ill. App. Ct. Nov. 8, 2004).

## II. LEGAL STANDARDS

### A. JURISDICTION AND CHOICE OF LAW

The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1). This case is before the Court on diversity jurisdiction. 28 U.S.C. § 1332. The parties to this action have agreed that the substantive law of the forum state of Illinois applies to this case. Where neither party argues that the forum state's choice of law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law. *ECHO, Inc. v. Whitson Co., Inc.*, 52 F.3d 702, 707 (7th Cir. 1995).

### B. SUMMARY JUDGMENT STANDARDS

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). At this stage, a court does not weigh

19

evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court must view all evidence and draw all inferences in favor of the nonmoving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). The movant is not required to make an affirmative showing that there are no material facts in issue. Instead, the movant need only show an "absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

For cross-motions for summary judgment, each movant must individually fulfill the stringent requirements necessary to obtain summary judgment under Rule 56. *See United Transp. Union v. Ill. Ctr. R.R.*, 998 F.Supp. 874, 880 (N.D. Ill. 1998). In deciding cross-motions for summary judgment, the court is not obligated to grant judgment as a matter of law for one side or the other. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983), *cert. denied*, 464 U.S. 805 (1983). The Court must evaluate each party's motion on its own merits, resolving all factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003).

### III. ISSUES PRESENTED

In its First Amended Complaint, Liberty Mutual states two claims against American Home. In Count I, Liberty Mutual asserts a cause of action for equitable subrogation against American Home for failing to reasonably negotiate a settlement of the Underlying Action. In Count II, Liberty Mutual asserts a cause of action for breach of a direct duty against American Home for failing to reasonably negotiate a settlement of the Underlying Action.

In its Memorandum in Support of its Motion for Summary Judgment ("L.M. Mot."),
Liberty Mutual claims that American Home breached its duty to Liberty Mutual by failing
to settle the Underlying Action for all or substantially all of its own policy, thereby placing
Liberty Mutual's excess policy at risk. It argues that American Home chose to "roll the dice"
with a jury by offering "ludicrously low" settlement offers instead of settling the case for an
amount that would not have touched Liberty Mutual's excess policy. L.M. Mot. at 1. Liberty
Mutual complains that, as a result of American Home's actions, Liberty Mutual is now
vulnerable under its excess policy to a multi-million dollar personal injury verdict. Liberty
Mutual seeks summary judgment on two issues: 1) that American Home owed a duty to the
excess insurers and 2) that American Home breached that duty.

American Home responds in its Memorandum in Support of its Motion for Summary
Judgment ("A.H. Mot.") that American Home owed no duty to Liberty Mutual because it did
not have control over the defense or settlement of the case. Even if there was a duty,
American Home argues there is no evidence that American Home's actions were the
proximate cause of Liberty Mutual's potential damages. Liberty Mutual seeks summary
judgment on three issues: 1) that American Home did not owe a duty to Liberty Mutual; 2)
that if there was a duty, it was not breached, and 3) that Liberty Mutual cannot prove that
American Home's actions caused its loss. This Court will first analyze the legal issues of
whether American Home owed Liberty Mutual a direct duty or a duty under the theory of
equitable subrogation.

## IV. DISCUSSION

The first issue in this case is whether American Home owed Liberty Mutual a duty to attempt to settle the Underlying Action within its policy limits. Liberty Mutual poses two theories for the imposition of such a duty. First, Liberty Mutual argues that American Home owed it a direct, common law duty to act reasonably and in good faith in attempting to settle the Underlying Action within American Home's policy limits. Second, Liberty Mutual asserts that American Home owed Liberty Mutual a duty under the doctrine of equitable subrogation. The "direct duty" theory would allow Liberty Mutual to sue American Home for its breach of duties owed to Liberty Mutual; the equitable subrogation theory would allow Liberty Mutual to sue American Home for its breach of duties owed to Canadian National.

## A. AMERICAN HOME DID NOT OWE LIBERTY MUTUAL A DIRECT DUTY

The first issue is whether Illinois recognizes a direct duty between insurers of American Home's and Liberty Mutual's status, where the insured, Canadian National, held a large self-insured retention and maintained control over the defense of all adverse claims. In order to properly apply Illinois law, this Court must first identify what type of insurance contract Liberty Mutual and American Home had issued to Canadian National.

### 1. American Home is an "Excess" Insurer

There are two general types of insurers: "primary" and "excess." The differences between primary and excess insurers are well established in Illinois. *See Krusinski Const. Co. v. Northbrook Prop. and Cas. Ins.* Co., 760 N.E.2d 530, 537 (Ill. App. Ct. 2001) ("Illinois law is clear that primary and excess insurers insure different risks."). The largest

difference is that the primary insurer, not the excess carrier, has the duty to defend its insured. *Royal Ins. Co. v. Process Design Assocs.*, Inc., 582 N.E.2d 1234, 1242 (Ill. App. Ct. 1991). The basis for this general rule is that liability for a primary insurer attaches immediately upon the happening of the occurrence that gives rise to liability; liability for an excess insurer attaches only after a predetermined amount of primary coverage has been exhausted. *Id.*; *Krusinski Const.*, 760 N.E.2d at 537.[10] Primary policies generally impose upon the insurer a duty to defend in addition to the duty to indemnify. *Id.* Rather than providing a duty to defend, most excess policies require the excess insurer to indemnify the insured for the costs of the defense as part of the "ultimate net loss" against which the policy insures. *Id.* at 537-38.

A court's primary objective in construing the language of an insurance policy is to ascertain and give effect to the intentions of the parties as expressed in their agreement.

---

[10] Illinois' definitions of excess and primary insurers appear to be fairly standard. In his treatise on Insurance, Couch defines an "excess insurer" as follows:

> Excess insurer: an insurer whose coverage of a given loss is activated only after the magnitude of the loss exceeds the limits of applicable "primary" insurance. Many policies (especially umbrella/catastrophe policies) are explicitly written to be excess insurance for most or all coverages under the policy, and make specific reference to "underlying" coverages that must be exhausted before the excess policy will provide coverage. In other circumstances, a policy written as "primary" insurance may become excess by virtue of the fact that more than one "primary" policy applies under circumstances where coverage is not prorated between them.

COUCH ON INSURANCE 3d § 1.4 (2004). "Primary insurer" is defined by Couch as: "an insurer whose coverage of a given loss is at the "first level" of loss (after satisfaction of any deductible); counterpart of excess insurance." *Id.*

*American States Ins. Co. v. Koloms*, 687 N.E.2d 72, 75 (Ill. 1997). If the terms of the policy are clear and unambiguous, they must be given their plain and ordinary meaning. *Id.* A court must construe the policy as a whole and take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. *Id.* In this case, there is no argument that Liberty Mutual is an excess insurer; the question is whether American Home is also an excess insurer.

The American Home Policy unambiguously labels American Home as an excess insurer; the policy is entitled "Claims Made Excess Liability Policy." Condition D of American Home's policy requires Canadian National to give American Home notice if any claim is expected to exceed 50% of the SIR. Condition E of the policy states explicitly that American Home will "not be called upon to assume charge of the settlement or defense of any claim" but gives it the right to "associate" with Canadian National in the defense and control of any such claim. Indeed, under Condition H of the American Home Policy, Canadian National has the ability to settle a claim within the policy limits without American Home's permission or involvement.

Construing the policy as a whole and taking into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract, this Court finds that American Home is an excess insurer. Canadian National retained a $5 million SIR under this policy.[11] It began investigating and defending the Underlying Action immediately

---

[11] *See General Star Indem. Co. v. Superior Court*, 47 Cal.App.4th 1586, 1593-94 (Cal. Ct. App. 1996) (finding that the insured's $100,000 SIR was the same as a

24

after the accident, with no outside assistance from its insurance companies. American Home did not become involved in the litigation until a few weeks before the trial. Unlike a primary insurer, American Home clearly had no duty to defend the suit. Therefore, in considering the plain and ordinary meaning of the policy and the purpose of the contract, this Court concludes that American Home is an excess insurer.

## 2.    Illinois Law is Silent as to Duties Between Two Excess Insurers

Having determined that American Home and Liberty Mutual are both excess insurers to Canadian National, the issue becomes whether Illinois recognizes a duty between two "excess" insurers. Specifically, the question is whether a "lower-tiered" excess insurer owes a direct duty to a "higher-tiered" excess insurer to settle the case within the "lower-tiered" excess insurer's own policy limits in order to prevent exposure to the "higher-tiered" excess insurer. No Illinois court has addressed this exact issue. In such a situation, the Court must resolve this unsettled question of state law as it thinks the Illinois Supreme Court would resolve it. *U.S. v. Navistar Intern. Transp. Corp.* 152 F.3d 702, 713 (7th Cir.1998) (*citing Konradi v. United States*, 919 F.2d 1207, 1213 (7th Cir.1990)).

Although Illinois courts have not addressed the issue of direct duties between excess insurers, there is a split in Illinois cases on the issue of direct duties from primary insurers to excess insurers. Illinois courts are divided on the issue of whether there is a direct duty that runs from primary insurers to excess insurers to act reasonably and in good faith in

---

"primary" insurance policy and that the first-layered insurer was an "excess" insurer).

attempting to settle claims within their respective policy limits. *Compare Schal Bovis, Inc. v. Cas. Ins. Co.*, 732 N.E.2d 1082, 1090 (Ill. App. Ct. 1999) (finding that a primary insurer owed an excess insurer a direct duty of good faith) *to U.S. Fire Ins. Co. v. Zurich Ins. Co.*, 768 N.E.2d 288, 300 (Ill. App. Ct. 2002) (holding that Illinois law does not recognize a direct duty of good faith between a primary and excess insurer). Although almost all states recognize a duty of good faith and fair dealing between a primary insurer and its insured, this duty is often derived from the contractual nature of the relationship. *See Twin City Fire Ins. Co. v. Country Mut. Ins. Co.*, 23 F.3d 1175, 1178 (7th Cir. 1994). Therefore, courts are often reluctant to impose an independent duty upon a primary insurer's liability to excess insurers when no contractual relationship exists.[12]

This Court recognizes that comparing the duties placed on primary to excess insurers with the duties placed on excess to excess insurers is not without its difficulties. As discussed above, the differences between primary and excess insurers are well established in Illinois. *See Krusinski Const. Co. v. Northbrook Prop. and Cas. Ins.* Co., 760 N.E.2d 530, 537 (Ill. App. Ct. 2001). Generally, the differences revolve around whether the insurer has a duty to defend the insured. Primary insurers often have exclusive control over the defense

---

[12] *But see, e.g., Am. Centennial Ins. Co. v. Am. Home Assurance Co.*, 729 F.Supp. 1228 (N.D. Ill. 1990) (applying Illinois law); *Ranger Ins. Co. v. Home Indem. Co.*, 714 F.Supp. 956 (N.D. Ill. 1989) (applying Illinois law); *Schal Bovis, Inc. v. Cas. Ins. Co.*, 732 N.E.2d 1082 (Ill. App. Ct. 1999); *Estate of Penn v. Amalgamated Gen. Agencies*, 372 A.2d 1124, 1127 (N.J. 1977); *Hartford Accident & Indem. Co. v. Mich. Mut. Ins. Co.*, 462 N.Y.S.2d 175, 178-79 (N.Y. 1983), *aff'd*, 463 N.E.2d 608 (1984); *St. Paul Fire & Marine Ins. Co. v. U.S. Fidelity and Guar. Co.*, 375 N.E.2d 733 (N.Y. 1978).

and settlement of a case. The primary insurer hires counsel, sets the defense strategy, and controls the development of underlying facts.[13] Despite these differences between primary and excess insurers however, this Court believes that a discussion of the duties in Illinois between primary and excess insurers is probative to predict whether the Illinois Supreme Court might recognize a duty between two excess insurers.

This issue was first discussed in Illinois federal courts. In two cases, *American Centennial Inurance. Co. v. American Home Assurance Co.*, 729 F.Supp. 1228 (N.D. Ill. 1990), and *Ranger Insurance Co. v. Home Indemnity Co.*, 714 F.Supp. 956 (N.D. Ill. 1989), two federal district courts decided that if the Illinois Supreme Court were faced with the issue, it would hold that a primary insurer owed a direct duty of care to an excess insurer "while conducting settlement negotiations of claims against the insured when it knows of the excess carrier's existence at the time of the negotiations." *Am. Centennial*, 729 F.Supp. at 1232; *see also Ranger Ins.*, 714 F.Supp. at 961. This prediction was based upon policy considerations and on the observation that "[c]ourts across the country are increasingly amenable to recognizing that a primary carrier owes a direct duty to an excess carrier."[14]

---

[13] *See TIG Ins. Co. v. Chi. Ins. Co.*, No. 00 C 2737, 2001 WL 99832, at *6 (N.D. Ill. Feb. 1, 2001) ("There is a major distinction between primary and excess insurers in this context. Unlike excess insurers, primary insurers have a duty to defend their insureds against any claim that potentially falls within the coverage of the policy.") (*citing Nandorf v. CNA Ins. Cos.*, 479 N.E.2d 988, 991 (Ill. App. Ct.1985). That duty includes the right to hire and direct counsel for the insured. *Id.*

[14]*Ranger Ins.*, 714 F.Supp. at 961(citing cases from New York, Michigan, New Jersey, and Western Virginia).

Two years later, a different Illinois district court disagreed with the decisions in *American Centennial* and *Ranger Insurance*. *See Walbrook Ins. Co. v. Unarco Indust., Inc.* Nos. 90 C 52111, 90 C 1519, 1992 WL 159266 (N.D. Ill. June 23, 1992). In *Walbrook*, the court found that the lack of a contractual relationship between the primary and excess insurer made it impossible to impose a duty. *Id.* at *3. The court stated: "[i]n the absence of a relationship, contractual or otherwise, between the primary and excess insurers, the court does not believe the Illinois Supreme Court would impose a direct duty upon the primary insurer." *Id.*

A later decision by the Seventh Circuit, *Twin City Fire Insurance Co. v. Country Mutual Insurance Co.*, 23 F.3d 1175 (7th Cir.1994) agreed with the *Walbrook* court and cast serious doubt upon the *American Centennial* and *Ranger Insurance* predictions.[15] In *Twin City Fire*, the Seventh Circuit found no valid reason to create a direct duty between a primary and excess insurer when excess carriers can get relief through indirect duties, such as the doctrine of equitable subrogation.[16] *Twin City Fire*, 23 F.3d at 1178. Further, the Seventh Circuit disagreed with the district courts' conclusion that direct duties were within the

---

[15] An earlier Seventh Circuit decision, *Certain Underwriters at Lloyd's London v. Fidelity and Cas. Ins. Co.*, 4 F.3d 541 (1993) also discussed the theory of direct duty between a primary and excess insurer. *Certain Underwriters*, 4 F.3d at 544. However, in that case, the court did not decide whether Illinois law would impose a direct duty because the court was uncertain about what jurisdiction's laws would apply. *Id.* ("The availability of direct duty recovery may depend on which state's law applies, and the parties have not briefed conflicts issues in this appeal.").

[16] *See infra*, Part IV.B (discussing the doctrine of equitable subrogation).

national trend. *Id.* Instead, the court found that "the overwhelming majority of American cases describe the duty that a primary insurer owes an excess insurer as one derivative from the primary insurer's duty to the insured." *Id.* Therefore, the court concluded that the Illinois Supreme Court would most likely find that there was no direct duty between a primary and excess insurer, saying: "[w]e are not clear why these [district court] judges expect that the Supreme Court of Illinois would buck the national trend." *Id.*

In 1999, the first Illinois appellate court addressed the issue of direct duty. In *Schal Bovis, Inc. v. Casualty Insurance Co.*, the Illinois Appellate Court for the First District of Illinois recognized a direct duty between a primary insurer to an excess insurer. 732 N.E.2d 1082 (Ill. App. Ct. 1999). In *Schal Bovis*, a construction accident gave rise to personal injury litigation. *Schal Bovis*, 732 N.E.2d at 1085. The two underlying primary insurers evaluated the "verdict potential" of the case at over $2 million but refused to contribute their policy limits ($1 million each) toward a proposed settlement of $2 million. *Id.* A jury verdict of $2,892,500 was returned in favor of the plaintiff. *Id.* The excess insurer sued the primary insurers, alleging that they negligently failed to settle the underlying action within their policy limits. *Id.* at 1086. The trial court granted the primary insurers' motion to dismiss. *Id.* at 1090. The appellate court reversed, holding that there is a duty which runs from primary to excess insurers to "act reasonably and in good faith in attempting to settle claims within their respective policy limits." *Id.*

The *Schal Bovis* court created the following standard for the direct duty from primary to excess insurers: when a claim threatens to exceed the primary coverage, "the reasonable

foreseeability that the claim may reach the excess policy creates a three-way duty of care to act reasonably and in good faith in settling meritorious claims within the policy limits." *Id.* The imposition of this duty is based on the notion that there is a special relationship between the policyholder, the primary insurer, and the excess insurer which creates "reciprocal duties of care" in conducting settlement negotiations. *Id.*

Three years after the *Schal Bovis* decision, a different panel of the Illinois Appellate Court for the First District found that there was no direct duty in Illinois between a primary insurer and an excess insurer in *U.S. Fire Insurance Co. v. Zurich Insurance Co.,* 768 N.E.2d 288, 300 (Ill. App. Ct. 2002). In that case, the owner of a recently constructed large high-rise building brought suit against building contractors for faulty construction. *U.S. Fire,* 768 N.E.2d at 291. The contractors were insured by a primary policy of $1 million and an excess policy of $10 million. *Id.* When the primary insurer finally settled the claim outside of its own policy limits, the excess insurer sued it, alleging that the primary insurer had breached the direct duty of care recognized in *Schal Bovis. Id.* The *U.S. Fire* court refused to follow the *Schal Bovis* precedent, characterizing the *Schal Bovis* language relating to direct duty as "mere dicta" and a "prediction." *Id.* at 300 ("Illinois does not impose a duty by the primary insurer to the excess carrier, despite the 'predictions' of the various courts.").

This Court recognizes that *Twin City Fire* and *U.S. Fire* place the continued viability of the *Schal Bovis* decision seriously in doubt. *See Twin City Fire Ins. Co. v. Country Mut. Ins. Co.,* 23 F.3d 1175 (7th Cir.1994) (interpreting Illinois law) (noting that no case decided by an Illinois court [before 1994] has held that the primary insurer owes a direct duty of care

to an excess insurer). However, although American Home argues that *Schal Bovis* is no longer good law in light of these decisions, this Court can only conclude that the fate of the doctrine of a direct duty between primary and excess insurers is uncertain in Illinois. It is true that *U.S. Fire* placed doubt upon the ruling in *Schal Bovis*. Moreover, it is also true that all of the California precedent that the *Schal Bovis* court relied upon has been overruled.[17] However, in the absence of clear Illinois case law overturning the holding in *Schal Bovis*, this Court proceeds upon the theory that the direct, common law duty between primary insurers and excess insurers is still a possible legal theory in Illinois.[18]

Nevertheless, this is not the question this Court is called upon to answer. This Court must predict whether the Illinois Supreme Court would find that there should be a direct duty running from one excess insurer to another.

### 3. The Illinois Supreme Court Would Not Impose a Direct Duty Upon One Excess Insurer to Another

The issue is whether the *Schal Bovis* reasoning should be followed to impose a direct duty upon American Home to Liberty Mutual. Liberty Mutual contends that even if

---

[17] *See, e.g., Transit Cas. Co. v. Spink Co.,* 156 Cal.Rptr. 360 (Cal. Ct. App. 1979) (recognizing a reciprocal duty of care between the policyholder, primary, and excess insurers), *overruled on other grounds, Commercial Union Assurance Cos. v. Safeway Stores, Inc.,* 26 Cal.3d 912, 917, 921 (1980).

[18] The district court judge in this case found that *Schal Bovis* was still good law when deciding American Home's motion to dismiss. In his minute order of November 8, 2002, Judge Holderman ruled: "Although *U.S. Fire Insurance Co. v. Zurich Insurance Co.* is dubious as to the continued validity of the *Schal Bovis* holding, *Schal Bovis* appears still to be good law." However, Judge Holderman also intimated that *Schal Bovis* might apply only if American Home was found to be a primary insurer.

American Home is considered an excess insurer, the rationale behind the imposition of a duty (to ensure that an insurer has incentive to enter into a reasonable settlement even if the expected liability approaches the limits of its policy) applies equally to any insurer in such a position to control the fates of the insurers above it (be it a "primary," "first excess," or other insurer).  Liberty Mutual contends that once Canadian National tendered its SIR to American Home, American Home was in control of Liberty Mutual's fate.

American Home argues that *Schal Bovis* is not persuasive in this situation because, unlike the defendant in *Schal Bovis*, American Home was not a primary insurer.  American Home argues that *Schal Bovis* clearly applies only to primary insurers and should not be stretched to apply to excess insurers because excess and primary insurers undertake drastically different obligations. *See Krusinski*, 760 N.E.2d at 537.  American Home argues that it did not have exclusive control over either the defense or the settlement of the case - Canadian National was involved throughout the entire case and during the settlement discussions.  Because Liberty Mutual cannot show that American Home was a primary insurer with exclusive control over both the defense and settlement, American Home argues that this Court should not impose a direct duty on American Home in this situation.

This Court is aware of only one instance where a court found a direct duty between two excess insurers.  In an unpublished opinion with very little legal analysis, the Ninth Circuit, interpreting California law, imposed a direct duty between two excess insurers. *TIG Ins. Co. v. General Star Indem. Co.*, No. 01-56541, 2002 WL 1766448 (9th Cir. July 31, 2002).  In that case, the court affirmed a decision finding that because the insured tendered

its SIR to the first excess insurer during mediation, the first excess insurer had a duty to the second excess insurer of good faith and fair dealing, despite the absence of a contractual relationship between the two. *Id.* at *1.

However, this Court is not aware of a single Illinois case finding a direct duty between one excess insurer and another.[19] Although this Court agrees that a title alone ("primary" or "excess") should not affect an insurer's common law duty of care, the amount that the insurer is involved in the defense and settlement of the case should affect its duties to others. Primary insurers play a much greater role in the litigation of a claim and are generally contractually obligated to control the defense and settlement of the claim.

In *Schal Bovis*, a case that Liberty Mutual cites in its motion as "directly on point," the primary insurers were in complete control of the defense and of the settlement. *See Schal Bovis*, 732 N.E.2d at 1085; L.M. Mot. at 18. In that case, the primary insurers evaluated the verdict potential of the underlying claim and made the decision on their own not to settle the case. *Id.* Such is not the case here. American Home, an "excess" insurer, became involved in defending the Underlying Action less than a month before the trial started. Even then, it was Canadian National's defense attorney who tried the case before a jury and kept full control over the litigation strategy that resulted in the verdict. Control over the defense of

---

[19] In all three cases where a court applying Illinois law imposed a direct duty, the duty was imposed upon a "primary" insurer. *See American Centennial Ins. Co. v. American Home Assurance Co.*, 729 F.Supp. 1228 (N.D. Ill. 1990); *Ranger Insurance Co. v. Home Indemnity Co.*, 714 F.Supp. 956 (N.D. Ill. 1989); *Schal Bovis, Inc. v. Casualty Ins. Co.*, 732 N.E.2d 1082, 1090 (Ill. App. Ct. 1999).

the litigation is an important factor in deciding whether to impose a duty. In this case, even American Home's suggestion that defense counsel not recommend a number to the jury was rejected. American Home did eventually become involved in settlement discussions, however, under the terms of the American Home Policy, Canadian National retained the right to settle the case above its SIR and to seek reimbursement from American Home. This Court believes that, given the differences the Illinois Supreme Court has noted between the duties of primary and excess insurers, it would not decide to impose a direct duty upon one excess insurer to another.

This prediction is supported by the Illinois Supreme Court's reasoning in *Cramer v. Insurance Exchange Agency*, 675 N.E.2d 897 (1996) and *Haddick v. Valor Insurance*, 763 N.E.2d 299 (2001). In these two cases, the Illinois Supreme Court struggled with the question of whether Illinois should recognize an independent tort of good faith and fair dealing between an insurer and its insured. *See Cramer*, 675 N.E.2d at 903. In these two cases, the Illinois Supreme Court acknowledged that the insurer owed its insured a duty to settle; this duty arose out of the contractual covenant of good faith and fair dealing between the parties. *Id.*[20] If the insurer breaches this duty by refusing to settle, it may be liable for the full amount of a judgment against the policyholder, regardless of the policy limits. *Id.* "The 'duty to settle' arises because the policyholder has relinquished defense of the suit to the insurer," because "the policyholder depends upon the insurer to conduct the defense

---

[20] See *infra*, Part IV.B.2 for a more thorough discussion of *Cramer* and *Haddick* and the duty to settle.

properly," and because "the policyholder has no contractual remedy because the policy does not specifically define the liability insurer's duty when responding to settlement offers." *Id.* In *Haddick*, the court again emphasized: "the basis for the [insurer's] duty to settle [which it owes to the insured] is the insurer's exclusive control over settlement negotiations and defense of the litigation." *Haddick,*763 N.E.2d at 303.

Out of the reasoning of the Illinois Supreme Court in *Cramer* and *Haddick,* emerge two very important conclusions: first, the Illinois Supreme Court has only recognized a duty to settle between two parties who are in a contractual relationship. The court consistently defines the duty to settle as impliedly arising out of the contract. *See Cramer,* 675 N.E.2d at 903; *Haddick,*763 N.E.2d at 303. Second, the Illinois Supreme Court consistently describes the basis of the insurer's duty as the insurer's exclusive control over the settlement and defense. In *Cramer*, the court discusses why it is necessary to recognize such a duty:

> In the typical 'duty to settle' case, the third party has sued the policyholder for an amount in excess of the policy limits but has offered to settle the claim against the policyholder for an amount equal to or less than those policy limits. In this circumstance, the insurer may have an incentive to decline the settlement offer and proceed to trial. The insurer may believe that it can win a verdict in its favor. In contrast, the policyholder may prefer to settle within the policy limits and avoid the risk of trial. The insurer may ignore the policyholder's interest and decline to settle.

*Cramer*, 675 N.E.2d at 903. These two conclusions suggest that the Illinois Supreme Court would not create a direct duty between American Home and Liberty Mutual because there is no contract between them and because American Home did not have complete control over both the defense and settlement of the case.

**4.    Policy Considerations Support the Finding of No Direct Duty Between Two Excess Insurers**

The creation of a direct duty between excess insurers strikes this Court as somewhat troubling. First, if the excess insurer is at the mercy of the primary insurer to properly defend the case, it is not equitable to place a duty on the excess insurer to settle the case within its own limits. That excess insurer would not have the benefit of having conducted discovery or controlling the litigation. Thus, settlement discussions would be difficult because of the lack of dependable information. In such a situation, the excess insurer may not know enough about the case to determine whether a certain settlement demand was even reasonable. The defense and settlement of a case are hopelessly intertwined. Decisions made by an attorney about the defense strategy often directly affect the possibility of settlement. For example, in this case, American Home's $2 million settlement offer made after closing arguments might not have seemed so out of place had Canadian National's attorney not decided to recommend an eight figure number to the jury.

Second, this Court must consider the feasability of enforcing a rule that would allow a court to impose a duty upon an insurer when the insurer had only partial control over the defense or settlement of the case. As discussed above, strategy decisions made during the defense or the settlement of a claim significantly affect one another. If the law allowed the imposition of a duty when an insurer only had partial control over either the defense or the settlement, a court would have to parse through a fact-intensive reconstruction of the defense of the underlying claim in order to determine who was at "fault." That is, the court would

have to determine if the excess insurer had enough control over the settlement and defense of the claim to take responsibility for the failure to settle. This would burden the courts with a strenuous, if not impossible, task. Such difficulties do not arise where one party has control over both the defense and the settlement of the case.

A third consideration is the ability of insurance companies to bargain for their rights and duties. Although courts might find that there is a reason to protect the insured[21] against insurance companies where the insurance companies perhaps have unequal bargaining power, there is no similar policy argument when both parties are large insurance companies. As the Seventh Circuit has queried: "Should courts strain to create novel tort duties on behalf of insurance companies? Do insurance companies need the protection of tort law against their own insureds and other insurance companies?" *Twin City Fire*, 23 F.3d at 1178. If those insurers want to create duties between themselves, they can certainly do so contractually. Therefore, if Liberty Mutual is unwilling to underwrite excess coverage without certain assurances from the insured or a lower level excess carrier, it can choose not to write the policy if those assurances are not given. Therefore, this Court finds that American Home did not owe a direct duty to Liberty Mutual.

---

[21] *See infra,* Part IV.B.2 (discussing the duty owed to an insured by the primary insurer to settle).

**B.     AMERICAN HOME DID NOT OWE LIBERTY MUTUAL A DUTY UNDER EQUITABLE SUBROGATION**

The next issue is whether American Home owed Liberty Mutual a duty to settle under the doctrine of equitable subrogation.

### 1.     The Doctrine of Equitable Subrogation Allows One Party to Assert Another's Claim

Equitable subrogation is a broad doctrine; "subrogation" is the substitution of another person in place of the creditor to whose rights he or she succeeds in relation to the debt, and gives to the substitute all the rights, priorities, remedies, liens, and securities of the person for whom he or she is substituted. COUCH ON INSURANCE 3d § 222.:5 (2004). In fact, subrogation has sometimes been referred to as "substitution." *Id.* Thus, equitable subrogation is a legal fiction which provides that a person who pays a third party's debt (the "subrogee") is substituted or "subrogated" to all the rights and remedies of that party ("the subrogor"). *Certain Underwriters at Lloyd's, London v. Fidelity and Cas. Ins. Co.,* 4 F.3d 541, 547 (7th Cir. 1993) (Coffey, J., dissenting) (interpreting Illinois law). In other words, the excess insurer "stands in the shoes of the insured." *Id.* Therefore, a subrogee acquires no greater or lesser rights than those possessed by the subrogor. *Id. (citing Dworak v. Tempel,* 161 N.E.2d 258, 263 (Ill. 1959) ("A person who, pursuant to a legal liability, has paid for a loss or injury resulting from the negligence or wrongful acts of another will be given the rights of the injured person against the wrongdoer."). Liberty Mutual is asking this Court to allow it to "step into the shoes" of Canadian National in order to assert a claim that Canadian National (as the insured) could have brought against American Home.

## 2. The Duty to Settle Can Be "Transferred" to a Third Party Under Equitable Subrogation

Although Illinois law is cloudy as to the existence of a direct duty between a primary and an excess insurer, the law is clear that a primary insurer owes a duty of care to the insured, which includes a duty to settle. *See Westchester Fire Ins. Co. v. General Star Indem. Co.*, 183 F.3d 578, 582-83 (7th Cir. 1999); *Haddick ex rel. Griffith v. Valor Ins.*, 763 N.E.2d 299, 303-04 (Ill. 2001). Illinois law is also well established that an excess insurer can use the doctrine of equitable subrogation to assert the insured's right to insist that the primary insurer use due care to avoid an excess judgment against the insured. *Id.* at 583. The doctrine of equitable subrogation thus allows an excess insurer to "step into the legal shoes" of the insured and acquire the insured's rights against the primary insurer. *Id.*

An insurer has a duty to an insured to act in good faith in responding to settlement offers. *Cramer*, 675 N.E.2d at 903. The basis for the duty to settle arises out of the insurer's exclusive control over settlement negotiations and its defense of the litigation. *Haddick*, 763 N.E.2d at 304. That is, the insurer's exclusive control over the outcome of the pending litigation creates a conflict of interest between the insurance provider and the insured. *Id.* In the "typical" duty to settle situations, the insured would prefer to settle a claim within the insurer's coverage rather than go to trial and risk having a judgment in excess of the policy limits. Of course, if the insurer would only be able to settle the case within the uppermost limits of its own policy, it would often prefer to go to trial and attempt to win a verdict in its favor. *Id.* Because the insured has bartered to the insurance company all of the rights

possessed by him to enable him to discover the extent of the injury and to protect himself as best he can from the consequences of the injury, and because no duty arises under the parties' contract, Illinois courts impose a duty upon the insurer to settle in good faith. *Id.* at 303; *Olympia Fields Country Club v. Bankers Indem. Ins. Co.,* 60 N.E.2d 896, 905 (Ill. App. Ct. 1945). This implied duty of good faith arises out of contract law, not tort law. *Twin City Fire,* 23 F.3d at 1179-80.

Thus the implied duty to settle is created by the relationship between the insurer and insured as parties to a contract. The traditional duty to settle case is composed of the following elements: 1) an insured contracts with an insurer, forming a contractual relationship; 2) the contract gives the insurer the exclusive right to conduct the defense and to settle or compromise the claim; 3) the insurer controls the defense and the settlement of the claim; 4) the insurer fails to settle the case in the face of a reasonable probability that the trial will result in a verdict over the insurer's liaiblity, breaching its implied contractual duty of care to the insured; and 5) a verdict is entered in excess of the insurer's coverage.

### 3. There is No Claim for Equitable Subrogation

The real issue before this Court is whether an excess insurer, who participated in the settlement negotiations of the underlying claim but did not control any aspect of the defense, owed any duty to settle to another excess insurer under the doctrine of equitable subrogation. The facts of this case tell us that the "primary" insurer of Canadian National was Canadian National - the company held an uninsured $5 million SIR. Canadian National hired counsel, conducted discovery, and prepared the case for trial. American Home was the next insurer

"in line" and was contractually obligated to insure any claims that exceeded Canadian National's SIR, up to approximately $17.5 million. Under Condition H of its contract with American Home, Canadian National had the ability to settle any claim for the full amount of American Home's policy. As an excess insurer with no contractual duties to defend claims against Canadian National, American Home did not hire its own counsel or become active in the case until January 17, 2002, just eleven days before the trial was set to begin. Therefore, the question is whether American Home's involvement in the case warrants this Court's application of the doctrine of equitable subrogation.

Liberty Mutual contends that American Home owed a duty to it under equitable subrogation because it assumed control of the settlement negotiations of the Underlying Action, thereby creating a duty to Canadian National to explore settlement negotiations reasonably and in good faith. Liberty Mutual admits that American Home was not in control of the defense of the Underlying Action. Further, Liberty Mutual acknowledges that American Home was not contractually obligated to defend or settle the claims against the insured. However, it argues that it would be illogical to exempt an insurer who actually assumes exclusive control of settlement negotiations from the duty to exercise such control reasonably and in good faith. Liberty Mutual cites a California case, *Diamond Heights Homeowners Assn. v. Nat'l Am. Ins. Co.*, 277 Cal.Rptr. 906 (Cal. Ct. App. 1991), for the proposition that "[a]ny insurer, whether excess or primary, in conducting settlement negotiations, is subject to an implied duty of good faith and fair dealing which requires it to consider the interests of the insured equally with its own and evaluate settlement as though

it alone carried the entire risk of loss." *Diamond Heights*, 277 Cal.Rptr. at 914.

American Home argues that Liberty Mutual cannot bring an equitable subrogation claim against American Home because it has failed to prove one of the necessary elements to a claim for equitable subrogation. Even assuming that American Home had complete control of the settlement,[22] American Home argues that one of the necessary elements to a claim for equitable subrogation is exclusive control over the defense, which American Home did not have. Furthermore, American Home argues that the insured here (Canadian National) controlled its own defense in this case and therefore, in a sense, dictated its own fate. It would be inequitable to allow one excess insurer to "step into the shoes" of Canadian National and "place liability solely on the shoulders of another excess insurer for failing to reasonably negotiate a settlement." A.H. Mot. 9.

This Court agrees with American Home for several reasons. First, a claim for equitable subrogation allows a party to "step into the legal shoes" of another. Thus, the excess insurer (the subrogee) acquires no greater or lesser rights than those of the insured (the subrogor). *Westchester*, 183 F.3d at 583. Here, Liberty Mutual is attempting to step into the shoes of Canadian National, the insured. However, Canadian National would not itself be able to bring a claim against American Home because it controlled the defense and was

---

[22] American Home also disputes the claim that American Home had complete control over the settlement process. It argues rather that it had a limited right to associate with Canadian National in its efforts and that it participated under its right of association. The mere fact that "Canadian National tried to absolve itself of its contractual duties at the eleventh hour" cannot serve as a basis for finding that American Home had the exclusive right to settle the case. A.H. Mot. 10.

its own "primary insurer." Furthermore, Canadian National had the contractual ability to settle the case within the American Home Policy limits. Therefore, in the absence of exclusive control by American Home over the defense and settlement of the Underlying Action, Liberty Mutual has no claim for equitable subrogation against American Home.

The Seventh Circuit discussed this very issue in a case applying Wisconsin law. In *Sta-Rite Industries v. Zurich*, the court dealt with a "hybrid" insurance policy where both the insurer and insured had the right to participate in the defense and settlement of the claim. 178 F.3d 883, 885 (7th Cir. 1999). When the insured attempted to sue the insurer for failing to settle the claim within its limits, the court granted summary judgment for the insurer, saying: "[w]here, as in this case, the insurance contract does not exclude the insured from participating in the defense and settlement of the claim, the rationale underlying the duty of good faith loses its force." *Id.* The court went on to explain that the primary basis for the duty to settle comes from the assumption that the insurer has exclusive control over the defense and settlement of the claim. *Id.* at 885-86.

Second, no Illinois court has ever placed a duty to settle upon an insurer who did not actually control all aspects of the defense and settlement of the case. This Court refuses to stretch the duty to settle to apply in a situation where the insurer had anything less than complete control. This duty to settle was created because "the policyholder has relinquished defense of the suit to the insurer;" leaving the insured to depend upon the insurer to conduct the defense properly. *Cramer,* 675 N.E.2d at 903. Thus, normally in this situation, the primary insurer has contracted for the right to have complete control over the defense and

settlement of the case. Because it has conducted all of the discovery and has itself prepared for trial, the insurer is in the best position to determine whether the case will involve excess liability. The insured depends upon that insurer, and that insurer only, to conduct reasonable settlement negotiations.

In this case, neither Canadian National nor Liberty Mutual depended upon American Home to defend *or* settle the claims properly. Indeed, the insured in this case, Canadian National, depended only upon itself. While it is true that American Home became involved in settlement negotiations at the very end of the case, it was by no means in control of the outcome of the case. Canadian National's counsel defended the case from the very beginning. Any information American Home gained about the possible settlement amounts came through Canadian National's own estimates. Moreover, Canadian National had the right, under its contract with American Home, to settle the case for all of American Home's policy. When Liberty Mutual contracted to insure Canadian National it should have learned that Canadian National was entitled to control its own defense.

Third, from a policy standpoint, if the law allows a duty to be placed upon an excess insurer once it becomes involved in the settlement negotiations, an excess insurer may refuse to voluntarily assist the primary insurer in settlement. That is, if an excess insurer could be exposed to the entirety of the other excess insurer's policies once it volunteers to take part in settlement negotiations, it may refuse to participate. The goal should be to promote settlement and to ensure that excess insurers take part in settlement negotiations even when under no contractual duty to do so.

44

Therefore, there is no duty under the theory of equitable subrogation because it would be inequitable to allow another excess insurer to make a claim that Canadian National would not be able to bring itself and because American Home did not have complete control over the defense and settlement. Because there is no duty under either the theory of direct duty or equitable subrogation, Liberty Mutual has no possible claim against American Home. Therefore, this Court does not reach the issues of breach or causation.

# V. CONCLUSION

Hindsight is always 20-20. Whenever a $54 million jury verdict is entered there is always plenty of second-guessing to go around. However, as an excess insurer, Liberty Mutual has no legal basis to second guess American Home's role in the failure of the Underlying Action to settle because American Home did not control the defense and the settlement of the Underlying Action. Under these circumstances, this Court concludes that Illinois law would not impose a direct duty from American Home to Liberty Mutual to settle the Underlying Action. In addition, because Canadian National controlled the defense and had the right to settle the litigation, the doctrine of equitable subrogation does not apply. Because American Home did not owe a duty to Liberty Mutual, there can be no liability. Therefore, **Liberty Mutual's Motion for Summary Judgment is denied and American Home's Motion for Summary Judgment is granted as to both counts of the Plaintiff's First Amended Complaint.**

**SO ORDERED THIS 22nd DAY OF DECEMBER, 2004.**

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies mailed to:**

Terry D. Weissman
Timothy P. Mahoney
Neal, Gerber & Eisenberg, LLP
Two North LaSalle Street
Chicago, Illinois 60602
(312) 269-8000

Counsel for Plaintiff

Matthew J. Fink,
Richard H. Nicolaides, Jr.
Bates & Carey LLP
191 North Wacker Drive, Suite 2400
Chicago, Illinois 60606
(312) 762-3100
(312) 762-3200 (fax)

Counsel for Defendant